**DELCO REMY, DIVISION OF GENERAL MOTORS CORPORATION,**
**Appellant,**

v.

**REVIEW BOARD OF the INDIANA EMPLOYMENT SECURITY DIVISION, John C. Mowrer, David L. Adams, and Joe A. Harris, as members of and as constituting the Review Board of the Indiana Employment Security Division, and Edgar M. Spearman, Appellees.**

No. 93A02–8608–EX–271.

Court of Appeals of Indiana,
Third District.

Feb. 24, 1987.

Herbert C. Snyder, Jr., Virginia P. Elliott, Barnes & Thornburg, Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., Richard Albert Alford, Deputy Atty. Gen., Indianapolis, Calvin K. Hubbell, Law Offices of Calvin K. Hubbell, Valparaiso, for appellees.

GARRARD, Presiding Judge.

### Statement of the Case

Delco Remy (Delco), a division of General Motors Corporation, appeals the decision of the Review Board of the Indiana Employment Security Division (Board) that Edgar Spearman was not discharged from his employment at Delco for just cause, and thus is eligible for unemployment compensation. We affirm.

### Facts

Delco, a manufacturer and designer of automobile electrical and ignition parts, was awarded a seventy-five million dollar project in winter 1981, requiring Delco to manufacture the new "9SI" Delcotron generator for passenger cars. Successful completion of this project was determinative of Delco's future in the manufacture of passenger automobile parts. In February 1983, the progress of the final assembly of the "9SI" was slower than Delco had expected. Manager and project coordinator, Ken Tullis, "had to come up with a prototype of the Delcotron at one of the plants in Anderson [Indiana]."

Production of the Delcotron prototype was scheduled to begin on March 1, 1985. Consequently, it was necessary that 2,000 wooden boxes be constructed and available on March 1 for shipping the prototypes. On February 25, 1985, Tullis contacted Spearman, a 30 year employee and maintenance supervisor for Delco, and other department supervisors to determine whether the boxes could be assembled in four days by employees at the Anderson plant. All of the supervisors which Tullis contacted concluded that the box assembly project could not be handled "in house." John Swann, Delco's general maintenance supervisor, instructed Spearman to aid Tullis in whatever was needed and, in stressing the urgency of this project, stated "Ed, I got to get some boxes made. I don't care how you get them made, I got to get them made." (Record, p. 212).

Later on February 25, 1985 Spearman contacted Jim Nichols, a general carpenter whom Spearman had known for 20 years, regarding Nichols' capacity to construct and deliver the wooden boxes. After learning that Nichols was unable to build the boxes, Spearman contacted a general con-

tractor to borrow a table saw which Spearman later learned was unavailable. Finally, Spearman telephoned his stepson, Richard Stewart, who operated an informal partnership, S & T Specialties, and was at that time working in Tennessee. After Spearman explained the construction specification and time constraints, Stewart agreed to build the boxes, $22 for one type of box and $23 for the other. Spearman immediately reported this information to Tullis who replied, "It doesn't sound bad. It's within the range that I had been thinking about...." (Record, p. 83). Tullis also stated that Delco anticipated paying as much as $30 per box in light of the urgent need for the boxes.

Stewart had no facility in Indiana in which he could build the boxes and had little time to make other necessary arrangements for completion of the box assembly project. To aid Stewart in completion of this project Spearman, on behalf of S & T Specialties, applied for a post office box, signed a credit application at a local lumber yard, and arranged for purchase and delivery of lumber for the box assembly project. Stewart completed the box assembly project and delivered the boxes to Delco within the March 1, 1985 deadline.

Upon the complaint of a union representative that the participation of Stewart and Spearman may have violated the union contract, investigative interviews were held during which Spearman was questioned concerning his involvement in the box assembly project. At the conclusion of the interviews, Spearman was discharged and later received a confirmation letter stating, *inter alia:*

"The following is in response to your requst for written confirmation of the reason for your discharge:

You were verbally notified on March 29, 1985 that you were discharged effective March 29, 1985 from your position as Supervisor-Maintenance for improperly using a position of trust and confidence with General Motors for your personal benefit and/or the benefit of others. As you know, that conduct is inconsistant [sic] with your obligation to the Corporation as enumerated in the General Motors *Guidelines for Employe Conduct* booklet."

(Record, p. 176).

On June 5, 1986 the Review Board of the Indiana Employment Security Division reversed the decision of an Employment Security Division deputy and held that Spearman's familial relationship with Stewart was not itself a conflict of interest, and Stewart's failure to divulge his relationship to Delco did not constitute a breach of the duty of loyalty.[1] Delco appeals.

We affirm.

---

1. The specific findings of fact and conclusions thereon are as follows:

"The Review Board, after reviewing all the evidence of record, makes the following findings of fact and conclusions of law:

The grounds for which employer relied for the discharge of claimant was claimant's failure to inform employer that his stepson was to provide contractual services for this employer, therefore, there was a conflict of interest and that claimant had breached the duty reasonably owed this employer.

The Review Board is unable to make a finding of ultimate fact that claimant improperly used his position for personal gain in that employer failed to submit any competent evidence of probative value to the contrary. In the absence of such evidence, we are unable to conclude that claimant benefited in any way by his stepson's building of boxes for this employer, therefore, no conflict of interest existed.

That the evidence of record is void of further evidence of probative value that claimant at any time did anything that could be considered a deliberate act designed to injure this employer, therefore, we must conclude that claimant did not breach the duty reasonably owed the employer.

The Review Board further concludes that claimant may have used poor judgment by failing to disclose to the employer that the individual building the boxes at most is tantamount to a good faith error of judgment or discretion and is not disqualifying.

IT IS THEREFORE ORDERED AND ADJUDGED that the decision of Referee Green be reversed and that claimant is found to have been discharged but not for just cause in connection with work within the meaning and intent of Chapter 15-1 of the Act. Claimant, if otherwise eligible, is entitled to benefits."

### Standard of Review

The Court of Appeals is bound by the Review Board's factual determinations as well as its decision unless the evidence would lead a reasonable person to reach a contrary result. *Byrd v. Review Board* (1984), Ind.App., 469 N.E.2d 463, 465; *Trigg v. Review Board* (1983), Ind.App., 445 N.E.2d 1010, 1012. We may not substitute our opinions and conclusions for those of the Board but must give deference to the Board's expertise. *Midwest Steel Erection Co. v. Comm'r. of Labor* (1985), Ind.App., 482 N.E.2d 1369, 1370. This court must not reweigh the evidence and must view the record of the administrative proceedings in the light most favorable to the Board's decision. *City of Indianapolis v. Review Board* (1982), Ind.App., 441 N.E.2d 36, 37; *and see Maxey v. Board of Zoning Appeals* (1985), Ind.App., 480 N.E.2d 589, 591.

### Discussion

The initial burden of proving that an employee was fired for just cause is on the employer. *Potts v. Review Board* (1985), Ind.App., 475 N.E.2d 708, 711. Just cause includes:

"(1) separation initiated by an employer for falsification of an employment application to obtain employment through subterfuge;

(2) knowing violation of a reasonable and uniformly enforced rule of an employer;

(3) unsatisfactory attendance, if the individual cannot show good cause for absences or tardiness;

(4) damaging the employer's property through wilful negligence;

(5) refusing to obey instructions;

(6) reporting to work under the influence of alcohol or drugs or consuming alcohol or drugs on employer's premises during working hours;

(7) conduct endangering safety of self or coworkers; or

(8) incarceration in jail following conviction of a misdemeanor or felony by a court of competent jurisdiction or for any breach of duty in connection with work which is reasonably owed an employer by an employee."

IC 22–4–15–1(d)(8) (West Supp.1986). The existence of just cause is a determination of fact to be made by the Review Board, and is conclusive and binding on the Court of Appeals. *Potts, supra.* Delco relies on subsection (8) above in asserting that Spearman reasonably owed a duty of loyalty which he breached by failing to divulge his familial relationship with Stewart.

We agree that Spearman, as Delco's agent, owed a duty of loyalty to Delco, the breach of which might constitute just cause for discharge. *Potts, supra.* However, unlike the situation in *Potts* where the claimant helped fund a competitor, the situation here does not necessarily demonstrate any disloyalty. Delco has not convinced us that Spearman's failure to divulge that Stewart was his stepson necessarily violated the duty of loyalty. Delco had no known antinepotism rule or explicit prohibition against dealings with family members. Absent such a rule, Spearman's familial relationship with Stewart was not critical to the box assembly transaction and hence, there was no special duty to divulge this information to Delco. Furthermore, construction of the boxes by some outside fabricator was in Delco's interest rather than opposed to it. Thus, the Board's decision that Spearman did not breach his duty of loyalty and thus is eligible for unemployment benefits is sustained by the evidence. We affirm.

Affirmed.

SHIELDS, P.J., and STATON, J., concur.